## Arcus Ticket Company, Appellant, v. William Hale Thompson, Appellee.

### Gen. No. 41,526.

Opinion filed February 26, 1941.

Henry L. Blim and Leonard A. Scholl, both of Chicago, for appellant.

James W. Breen, of Chicago, for appellee; Samuel L. Golan, of Chicago, of counsel.

Mr. Presiding Justice Hebel delivered the opinion of the court.

This is an appeal by the plaintiff from a judgment entered finding the defendant not guilty. The action is one for breach of a written contract by the defendant. Under this contract plaintiff was to print for the defendant 500,000,000 coupon roll tickets, said tickets to be delivered beginning in November, 1930.

The complaint was filed by the plaintiff alleging the execution of the contract, partial fulfillment thereof by the plaintiff, the refusal of the defendant to take further tickets under the contract, claims damages for the breach of the contract by the defendant and sets up in detail the items of damage.

Prior to the trial of the cause, defendant filed two answers, which answers denied most allegations of plaintiff's complaint, and did not set up any affirmative defense, except that the second answer did set up the defense of lottery, as being in violation of the Illinois Revised Act of 1937. Plaintiff filed a reply denying the new matter pleaded in the second answer of the defendant pertaining to the alleged lottery and averring that plaintiff had nothing to do with the plan or scheme involved and had no knowledge thereof.

After trial, and after judgment had been entered in favor of defendant, on June 25, 1940, the trial of the cause having finished on that day, defendant filed a new answer setting up in effect the plea of accord and satisfaction and a plea that the contract was contrary to public policy for the reason that a lottery was involved, which new answer was filed over the objection of the plaintiff. The filing of this answer was the first and only time that defendant had offered or interposed the defense of accord and satisfaction. The cause was tried before the court without a jury and

at the close of all the evidence, the court found for the defendant and against the plaintiff.

Plaintiff's theory is that it fully performed its part of the contract until stopped by the defendant; that it was ready, willing and able at all times to finish the contract; that it suffered substantial damages, which were alleged and proven; and that there had been no settlement of the controversy by way of accord and satisfaction or otherwise, and that the defense of lottery, if properly pleaded, was not pertinent to the issues, as the plaintiff had no part in the proposed lottery, and its printing of the tickets for the defendant was such a transaction separate and apart from the alleged lottery, as would make the defendant liable in any event.

The plaintiff calls our attention that apparently defendant's theory is that at some time after the making of the contract and in or about the month of February, 1931, the defendant by making his last payment to the plaintiff had fully settled all matters in controversy; and that inasmuch as the tickets printed and to be printed for the defendant were in connection with a plan or scheme to award prizes in a drawing, that thereby the whole plan was contrary to public policy, and that as a result thereof the contract between plaintiff and defendant was against public policy.

The facts as they appear in this record are that prior to November 10, 1930, Critchfield & Company, an advertising agency, conceived the details of a so-called "Prosperity Drive" for William Hale Thompson. The complete details and plans of this prosperity drive were set out in a 7-page proof of a folder prepared by Critchfield & Company, which was in the possession of the defendant prior to his first conversation with Mr. Arcus, president of the Arcus Ticket Company. This plan provided in substance for the distribution of $1,000,000 in prizes, the plan being to have merchants purchase tickets through

banks and other distributing points, which tickets would be furnished by William Hale Thompson, and to have merchants distribute one of these tickets with every 25 cent purchase made by a consumer in any co-operating retail establishment. The tickets were to be numbered and be in duplicate—one-half to be retained by the merchant and one-half by the recipient consumer. The retained coupon was then to be placed in some sort of container and drawings were to be held from time to time over a period of 13 weeks, and several thousand prizes aggregating a total of $1,000,000 were to be distributed to the holders of the winning number. Further details of this plan were contained in a mimeographed circular, a copy of which circular was given to Mr. Arcus, president of the plaintiff company, on the occasion of his first visit to Mr. Thompson to discuss the details of the proposed printing of tickets.

The contract that was entered into between the parties provided for the printing by plaintiff for the defendant of 500,000,000 coupon roll tickets at 22¢ per thousand, tickets to be printed on a special paper with an agreement that the plaintiff was to contract with a mill for 330 tons of paper and secure a written agreement from the mill that it would not make a similar paper for anyone other than the Arcus Ticket Co. for 90 days after the closing of the prosperity drive. The tickets were to be delivered to the defendant in lots of at least 6,000,000 per day starting on November 28, 1930. The contract provided that Louis E. Golan was named by the defendant as his representative and agent in all matters pertaining to the contract.

It appears from the facts which do not seem to be disputed that plaintiff printed under this contract 85,000,000 tickets of which 16,000,000 were delivered leaving a balance of 69,000,000 undelivered. Defendant paid for the entire 85,000,000 tickets printed, at the contract price of 22¢ per thousand. After the de-

livery of the 16,000,000 tickets, plaintiff was unable to secure instructions from defendant as to the delivery of the remaining 69,000,000 tickets, and they remained in plaintiff's warehouse. Delivery under the contract—it is alleged—through no fault of plaintiff, dragged through the month of December and into January. In the meantime, not being able to deliver these 69,000,000 tickets, the plaintiff stopped printing under the contract.

The defendant in his reply to the statement of facts calls attention to the fact that the holders of the duplicate of the tickets were to receive cash prizes in various amounts; and further that the winning of the prizes was entirely a game of chance, and constituted a lottery under the statutes of the State of Illinois, the ordinances of the city of Chicago and the statutes of the United States; that when this fact was brought to the attention of the defendant, he directed the stopping of any further performance by the plaintiff in accordance with the contract. All tickets printed were paid for by defendant, and all paper purchased by plaintiff for use in the printing of said tickets, was paid for by the defendant. Plaintiff admits that it did not use all of said paper printing the tickets required to be printed under the alleged contract, but that it used some of the paper for other jobs, and still has some in stock, which was paid for by the defendant.

James S. Arcus, president of the plaintiff company, testified that he fully understood that there was to be a drawing for prizes with the tickets authorized to be printed under the contract. He testified that the drawing was a local affair, and that he did not consider the Federal Government had anything to do with it, as the drawing was to be held in the State of Illinois. He further testified that he told the defendant that he had had considerable experience with local drawings, and that he thought that local drawings were all right, and that "I do now, but I didn't know then that the Fed-

eral Government considered the fact that if any merchant from out of the State of Illinois wrote into the State of Illinois to pay for the tickets, that the Federal Government might consider that a Federal violation.''

This suit is for profits that plaintiff alleges it would have made under the contract had it been permitted by the defendant to print the 500,000,000 tickets in accordance with the contract. The plaintiff admits that it received pay for all tickets printed, and for the purchase of a sufficient quantity of paper to enable it to print the entire 500,000,000 tickets. It is also conceded that plaintiff did not use all of the paper purchased by it for the printing of tickets for the defendant, but that it used some of the paper for other jobs, and still has some on hand, for which defendant has paid. That the plaintiff considered the possibility of a violation of the law in the execution of said contract is established by one of the paragraphs in the contract, which reads;

''The undersigned hereby agrees to protect and save harmless the Arcus Ticket Co. of and from any or all liability, loss or damage that might result in the event that the printing, sale or distribution of the tickets hereby ordered is held to be in violation of any law or statute.''

As already indicated, the defendant paid the sum of $29,426.95, which said sum completely covered the work performed by plaintiff under the contract and paid for the purchase of all of the special paper on which the said 500,000,000 tickets were to be printed. The plaintiff in this suit is only attempting to recover profits it claims it would have made had it not been stopped by the defendant from carrying out the contract.

The defendant contends that the plaintiff admitted on the stand that it received payment for all tickets printed and for the price of more paper than it used in work for the defendant, and contends that the de-

fendant proved his case by a preponderance of the evidence. As already indicated, the plaintiff was paid the sum of $29,426.95, which sum included payment for all tickets printed, whether delivered or not, and for a sufficient amount of paper for the printing of the entire 500,000,000 tickets. At the close of the evidence, the trial court said:

"On the point of accord and satisfaction, I am inclined to think this way, that under the testimony of Mr. Arcus yesterday, I would almost be constrained to grant the defendant's motion for a finding because in effect here was his testimony. He said on cross-examination that at least Thompson ought to pay him now for the cost of the paper, 'I think at least he ought to pay some ten thousand dollars.' This was the amount he got in addition to the actual payment for the eighty million tickets, and the natural and fair implication from that would be at least 'I ought to have that ten thousand dollars to satisfy my requirements.' That was not in there. Then counsel for the defendant questioned him further and he said 'No, that didn't complete the contract.' If it had not been for that 'no,' it would have occurred to me that he accepted the ten thousand dollars in final, full and complete settlement of what he expected under this contract from Thompson. So today the defense comes on with the witness and bears out that implication." This is based upon the evidence that was heard by the court. Louis E. Golan testified that he told James E. Arcus, president and treasurer of plaintiff corporation, in February, 1931, that the federal authorities had definitely indicated they were going to call this a lottery and that the defendant didn't want to take delivery of the tickets; that Mr. Arcus then said: "I have printed them, and I need the space in my warehouse, and I've got to deliver those tickets to you, and I've got to be paid for them." Golan further testified that he later received a call from Arcus, in which Arcus told him

that the Federal Government had definitely determined that this was a lottery, and that no further tickets could be printed, and that he wanted payment for the paper that he purchased for the entire job of some 500,000,000 tickets; that Arcus thought he was entitled to be paid for the printing job, and for the paper that he had contracted for, and that he was not going to go ahead with any further printing of these tickets because of the action taken by the Federal Government. The plaintiff denies and disputes part of the testimony of Mr. Golan; however, the court heard the evidence, and on the facts before the court, a finding was entered for the defendant based upon the evidence as it was submitted.

The defendant paid the plaintiff the sum of $29,426.95, which sum completely covered all work performed by plaintiff under the contract and the purchase of enough paper for the printing of the entire 500,000,000 tickets. The adjustment was reached when the plaintiff indicated that it should be paid for the paper that was ordered and on hand for the printing of the tickets, and upon the acceptance of this suggestion by the defendant the payment of $10,726.95 was made. This adjustment and payment indicates that there was a settlement.

When we come to consider the questions that were testified to we must also have in mind that provision of the contract in which the defendant agreed to ''protect and save harmless the Arcus Ticket Co. of and from any or all liability, loss or damage that might result in the event that the printing, sale or distribution of the tickets hereby ordered is held to be in violation of any law or statute.'' This provision clearly evidences the fact that plaintiff wanted to be protected from any liability that might occur by reason of its doing the work called for by the contract.

From the facts that were considered by the court, we are of the opinion that the court did not err in enter-

ing a finding for defendant of not guilty, and for the reasons stated in this opinion the judgment that was entered on the finding will be affirmed.

*Affirmed.*

DENIS E. SULLIVAN and BURKE, JJ., concur.